UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 18-10279-FDS |
| | ) | |
| JAMES R. TALLACH | ) | |
|     Defendant | | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant James R. Tallach respectfully submits this Memorandum in aid of sentencing after admitting to possessing and distributing child pornography over the internet in violation of 18 U.S.C. § 2252A(a)(2) and 18 U.S.C. § 2252A(a)(5)(B). In this memorandum, Mr. Tallach urges the Court to sentence him to 60 months in prison followed by 60 months of supervised release, the mandatory minimum term.

At the conclusion of any sentence, Mr. Tallach faces deportation, due to a final order of removal issued on June 28, 2018.

### I. THE SENTENCING GUIDELINES

Mr. Tallach's guideline range is as follows:

• base offense level is 22, in accordance with USSG § 2G2.2(a)(2);

• increased by 2, in accordance with USSG § 2G2.2(b)(2), because the offenses involved material depicting a prepubescent minor or a minor who had not attained the age of 12 years;

• increased by 5, since defendant distributed in exchange for any valuable consideration, but not for pecuniary gain, USSG §2G2.2(b)(3)(B);

• increased by 4, in accordance with USSG § 2G2.2(b)(4), because the offenses involved material that portrays sadistic or masochistic conduct or other depictions of violence;

1

• increased by 2, in accordance with USSG § 2G2.2(b)(6), because the offenses involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material;

• increased by 5, because the offenses involved 600 or more images.

The subtotal of 40 is reduced by 3 for acceptance of responsibility. The final guideline is 37, in CHC I, so 210-262 months.

II. **HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Mr. Tallach is 49, the youngest of three children born to parents in Glasgow, Scotland. His father, an abusive man toward both his wife and to Tallach's two sisters, abandoned the family when Tallach was 2. Tallach never saw him again. After the separation, Tallach lived with his mother, sisters and his maternal grandmother. As the years passed, his mother met and later married his stepfather, who was about 12 years younger than she was. He adopted defendant, then about 7 years old, and young James took his surname. The senior Mr. Tallach worked as a car mechanic and truck driver; his wife as a crossing guard. Their relationship was warm and close. When she died at age 54, he grieved deeply.

Their family circumstances were often precipitous: the family received some government support for coal for heating and had a pay box on the household utilities; if no money was paid, no service was provided. He was 14 before the household had a phone. His stepfather was a disciplinarian at a time when punishment with a belt was considered ordinary discipline. Young James was engaged in his studies and pushed himself hard. As well, he was a capable singer, from age 9 singing in Robert Burns' competitions within his school and taking lessons. However, at age 14, his voice broke, and when he tried to resume singing at age 18 his voice no longer had the same quality.

He was educated at Castlehead High School in Paisley, Scotland. He graded at the top level which would have permitted him at age 16 to move to the university, but he elected to

remain for 2 more years, which ensured training. He earned a part time job with a company while in school, as well as academically earning a higher level certificate (the equivalent here of graduation), completing the program at age 17. From 1987 to 1998 (when he came to the United States), he was studying coding, largely at the company for whom he worked, and thereafter worked as a computer programmer, including doing free-lance work. At the same time, he developed a new interest: a friend invited him to try out for a production of Brigadoon by an amateur theater company, generating a life-long interest in the theater.

At about age 21, he met his first spouse at work. They married in 1993 in Erskine, Scotland and had at the outset a good relationship. In the ensuing years, while still in his twenties, he began to question his sexuality and confided this to his wife, who was very surprised. They separated on good terms in 1998, shortly before the defendant moved to the United States. They divorced in 2006.

Following the marital separation, he wanted to make a fresh start and to leave places where he was known. He was recruited to perform computer programming in the United States and decided to move, coming to the United States on a visa. His visa, linked as it was to his employment, expired in 2003, when the company he worked for went under when its principal customer, a bank, also went under. He tried to adjust his status, but was unsuccessful, and remained in the United States with no status.

He met his second spouse in 2001 while both were performers in a theater production. They entered into a civil commitment in 2005 in Cambridge, MA, and married in 2012 in Malden, MA. The marriage later foundered, in part due to defendant's developing substance abuse problems which defendant believes related to his efforts to self-medicate and cope with his mental health problems, including ongoing depression. They separated in June 2018. Mr. Tallach was shaken by the abrupt end of this marriage.

As with his marriage, Tallach's entire life unraveled with his drug use. It impaired his judgment and his control over his actions. As his use of methamphetamine escalated, his life became unglued by the addictive draw he could not resist even as it dragged him down. So a man, faultless for his first 45 years, now faces difficult consequences even as his health fails. As matters stand, he has open charges in state court pertaining to methamphetamine, one in Superior Court, both of which he must face.

Mr. Tallach has chronic and significant health problems, which are set out in more length in the presentence report. He has chronic sinusitis, linked to his asthma, with five surgeries to fix his septum and drain his sinuses. He has arthritis, which started with intense pain for which he was treated at Spaulding Hospital. He has HIV for which he is under continuing medication. In October 2018, he was taken in custody from Plymouth to the Beth Israel clinic, where he was examined for continuing and significant chest pain. When the pain both continued and worsened, he was returned to Beth Israel for a wrist angioplasty, which detected an 85% arterial occlusion and multi-vessel coronary artery disease, including sequential lesions in the right coronary artery. A cardiac stent was inserted in his right coronary artery on June 25, 2019 and he was discharged with antiplatelet therapy and cholesterol therapy. His doctor told him that he had likely suffered one or several previous heart attacks (he had long experienced heartburn).

A contributing factor to his risk of further cardiac events and/or of a stroke is his insufficiently treated diabetes. Since approximately 2016, he has suffered from diabetes, initially Type 2 Diabetes, which had been controlled by medications. Since being in detention, his condition has worsened. Upon entering custody, his hemoglobin A1c level was 7; it is now 13.5, a dangerous level posing risks to his heart, liver, kidneys, eyes, circulatory systems, and vascular system. As reflected in the medical records from Plymouth County Correctional Facility, Mr. Tallach met with Plymouth staff on August 21, 2019 and told them that his diabetes was not well controlled and that his vision had been fuzzy. He was told that he had an eye exam at the facility

four months previously, which excluded diabetic retinopathy. However, as the Presentence Report notes, "There is not a clear indication in the medical records that this test was actually performed." Diabetic retinopathy is a complication of diabetes caused by damage to the blood vessels of the light-sensitive tissue in the retina, placing the person at risk, if the diabetes is uncontrolled, of blindness. Current records reflect that his blood sugars have increased and that he is now prescribed 1500 mg. (three 500 mg. pills) of Metformin. He has been prescribed a cardiac low salt/fat diet, but the staple of his diet is white bread, an indication that Plymouth has no cardiac diet by any reasonable measure.

He suffers from chronic pain in his back, shoulders, and joints. He cannot sit in chairs without backs and has significant physical limitations.

He is subject to deportation. Records from Immigration and Customs Enforcement reflect that he entered the United States on April 11, 1999 and that on June 28, 2018, a final order of removal and deportation was entered.

He remains close to, and is in frequent phone contact with, his surviving sister who lives in Ayrshire, Scotland; his second sister died in 2017 at age 53 from cancer.

III. **The Child Pornography Guideline**

Since the promulgation of the child pornography guideline, the offense level applicable to Mr. Tallach's conduct has risen by 19 levels, from 18 to 37, and the applicable range has risen from 27-33 months to 210-235 months, an increase almost 9-fold, as demonstrated in the following table:

**Effect on Defendant's Guideline Range Over Time**

| *Guideline Version* | *Applicable Guideline Section* | *Offense Level Calculation* | *Guideline Sentencing Range* |
|---|---|---|---|
| Original Guideline (1987) | § 2G2.2 | 13 Base Offense Level<br>+2 Prepubescent minor<br>+5 Distribution<br>-2 Acceptance of responsibility<br>**18** | **27-33 months** |
| 1991 Guidelines | § 2G2.2 | 15 Base Offense Level<br>+2 Prepubescent minor<br>+5 Distribution<br>+4 Sadistic or masochistic material<br>-3 Acceptance of responsibility<br>**23** | **46-57 months** |
| 1996 Guidelines | § 2G2.2 | 17 Base Offense Level<br>+2 Prepubescent minor<br>+4 Sadistic or masochistic material<br>+2 Use of computer<br>+5 Distribution<br>-3 Acceptance of responsibility<br>**27** | **70-87 months** |
| 2003 Guidelines | § 2G2.2 | 17 Base Offense Level<br>+2 Prepubescent minor<br>+5 Distribution<br>+4 Sadistic or masochistic material<br>+2 Use of computer<br>+5 Number of images (more than 600)<br>-3 Acceptance of responsibility<br>**32** | **121-151 months** |
| 2004 Guidelines | § 2G2.2 | 22 Base Offense Level<br>+2 Prepubescent minor<br>+5 Distribution<br>+4 Sadistic or masochistic material<br>+2 Use of computer<br>+5 Number of images (more than 600)<br>-3 Acceptance of responsibility<br>**37** | **210-262 months** |

Most of this extraordinary increase was mandated by Congress, sometimes over the opposition of the Commission itself. United States v. Dorvee, 616 F.3d 174, 184-85 (2nd Cir. 2010). This legislative freestyling, unlinked to data support, has met with strong judicial disapproval. In Kimbrough, the Supreme Court addressed the crack guidelines, which albeit not directly mandated by Congress, were based on congressional policy, and the Court refuted Congress's reasons for its policy. Kimbrough v. United States, 552 U.S. 85, 94-99 (2007). A similar

6

infirmity exists here; in dictating much of the content of § 2G2.2, Congress relied on assumptions which were unsupported at the time and which more recent research and data no longer support. This Court may properly find that the child pornography guideline was not developed by the Commission in its characteristic institutional role of basing its determinations on empirical data and national experience, see Kimbrough, 552 U.S. at 109-10, consistent with the Supreme Court's repeated recognition that when a guideline was not developed by the Commission based on empirical data of past sentencing practices and national sentencing experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives," and that a policy-based variance from such a guideline is not subject to "closer review" and is "not suspect." See Kimbrough, 552 U.S. at 109-10.

Indeed, Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[1] Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. There is, however, a lack of evidence to support this belief, see U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ["Report to the Congress"] at 104, confirming "not all child pornography offenders are pedophiles or engage in other sex offending." See also United States v. Marshall, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly

---

[1] *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); *id*. at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); *see also generally* Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).

suggests that viewing child pornography does not equate to child molestation"); United States v. Kelly, 868 F.Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); United States v. Cruikshank, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); United States v. Phinney, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); United States v. Grober, 595 F. Supp. 2d 382,404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), aff'd 624 F.3d 592 (3d Cir. 2010).

Indeed, it is legitimate to note that the sentencing of child pornography offenders has been politicized to a degree not present in other cases. Sometimes this is framed as decision-making based on moral judgments, rather than careful empirical analysis. See Excerpt Transcript of Sentencing at 5, United States v. Bhavsar, Criminal No. 10-40018-FDS, ECF No. 56.

Perhaps no other guideline has been so roundly criticized by the courts. The Second Circuit described the child pornography guideline as "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." Dorvee, 616 F.3d at 188. The Dorvee Court further analyzed how the mechanical application of the child pornography guidelines was "fundamentally incompatible with § 3553(a)." Id. at 187. Specifically, the Court addressed the dizzying array of enhancements that apply in almost every

case. The frequency of certain enhancements in the child pornography guideline was acknowledged in the Sentencing Commission's Report to the Congress, supra, finding that in non-production cases, several of the sentencing enhancements applied in the vast majority of § 2G2.2 cases:

**FY10 Application Rates of Enhancements in §2G2.2**

|  | All §2G2.2 Cases N = 1654 | Possession N = 874 | Receipt N = 428 | Transportation/ Distribution N = 352 |
|---|---|---|---|---|
| P/P/M | 96.3% | 95.4% | 97.4% | 96.9% |
| S/M | 74.2% | 68.1% | 80.1% | 82.1% |
| Distribution | 41.6% | 26.8% | 33.9% | 87.8% |
| Use of Computer | 96.3% | 95.8% | 96.0% | 97.7% |
| Number of Images | 96.9% | 94.6% | 98.4% | 94.6% |
| Pattern of Activity | 10.2% | 7.3% | 13.3% | 13.6% |

The Commission itself explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions." Id. at ii.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." Id. at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism-some of them very significant,'" id. at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." Id. at 282. The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." Id. at 104. "[T]he current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic

images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Id. at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." Id. at xx; see also id. at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." Id. at xviii, 322.

Judicial dissatisfaction with the guideline is reflected in sentencing outcomes. As evidenced in the USSC's 3rd Quarter 2019 Preliminary Cumulative Data (October 1, 2018, through June 30, 2019), the percentage of within-guideline dispositions for Child Pornography offenses nationally is 30.8%, contrasted with an overall within-guideline rate for all offenses nationally at 51%. Additionally, the mean and median decrease in departure cases nationally was 48.5% mean and 44.8% median. See Table 17.

Every session in the District of Massachusetts to address the child pornography guidelines, including this Court, has given them limited weight and, in the appropriate case, almost no weight. See, e.g., United States v. Bhavsar, supra, No. 10-cr-40018-FDS (guideline of 41-51 months, sentenced to 3 months); United States v. Michael Pavlis, No. 10-cr-40032-FDS (guideline of 57-71 months, defendant sentenced to 33 months where the defendant had described, in internet chats, plans to travel to Texas with a 9 year old boy so that the other man could have sex with the boy); United States v. William Davis, No. 10-cr-40027-FDS (guideline of 57-71 months, defendant sentenced to 37 months for possessing and distributing hundreds of images of child pornography via a peer-to-peer network, at a time when he was also hosting sleepovers for a group of 15 year old boys where he furnished alcohol to them); United States v.

10

Manganelli, No. 13-cr-10300-FDS (guideline of 97-121 months, sentenced to 60 months); United States v. Keller, No. 12-cr-10377-FDS (guideline of 168- 210 months, sentenced to 78 months); United States v. Wieprecht, No. 10-cr-30038-FDS (guideline of 292-365 months, sentenced to 135 months); United States v. Wood, No. 10-cr-40025-FDS (guideline of 97-121 months, sentenced to 37 months). See also United States v. Mark Rita, 12-CR-10045-MLW (accessing child pornography, 70-87 month guideline range, sentenced to five years' probation); United States v. Kevin Andre, 13-CR-10267-DPW (possession of child pornography, guideline range of 97-120 months, government recommendation of below-range sentence of 41 months, 24 month sentence imposed); United States v. Richard Doherty, 11-CR-10328-DJC (possession of child pornography, guideline range of 97-120 months, government noted defendant had in excess of 10,000 images and could have been charged with distribution but recommended below-range sentence of 33 months, 18 month sentence imposed); United States v. Christopher E. Reardon; 11-CR-10325-JLT (possession of child pornography, guideline range of 97-120 months, sentenced to five years of probation); United States v. Brian Wilkerson, 09-CR-30013-MAP (receipt of child pornography, guideline range of 78-97 months, sentenced to 60 months mandatory minimum); United States v. William Noble, 11-10284-NMG (distribution of child pornography, guideline range of 151-188 months, sentenced to 81 months, "the Court largely discounts [certain] enhancements" to find lower guideline 78-87 months applies); United States v. Donald Slason, 11-CR-10108-PBS (possession of child pornography where government agreed to dismiss distribution count, guideline range of 51-63 months and government recommendation of 30 months, sentence of 21 months imposed); United States v. Timothy S. Kelly, 10-CR-10291-RGS (receipt of child pornography, guideline sentencing range of 210-262 months, sentenced to mandatory minimum of 60 months jointly recommended by defendant and government); United States v. Stanley MacKinnon, 10-CR-10227-RWZ (receipt of child pornography, guideline range of 151-188 months, government below guideline recommendation

11

of 78 months, sentenced to the mandatory minimum 60 months); United States v. Simeon Stefanidakis, 10-CR-10174-WGY (distribution of child pornography, guideline range of 151-188, sentenced to 84 months); United States v. Steven Hooper, 12-CR-10156-GAO (possession of child pornography, guideline range of 97-120 months, sentenced to 60 months' imprisonment).

Overall, the enhancements which drive the ever-higher sentences in instances such as the present, although characterized as "Specific Offense Characteristics," are anything but "specific," as the court in Dorvee pointed out, in that they apply to almost all convictions under the guideline. Dorvee, 616 F.3d at 186 (noting that application of these enhancements "that are all but inherent to the crime of conviction" results in a "13 level [increase], resulting in a typical total offense level of 35"). The guideline here calls for a staggering sentence, near the statutory maximum, due in large part to enhancements that are essentially meaningless. Without the 15 points in enhancements, Tallach's guideline range would be offense level 22 minus 3 for acceptance, so 19, so 30-37 months. Such a sentence would better appropriate the appropriate punishment.

IV. **CONSIDERATIONS IN REACHING AN APPROPRIATE SENTENCE**

Under 18 U.S.C. § 3553(a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2). The sentence must 1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; 2) afford adequate deterrence to criminal conduct; 3) protect the public from further crimes of the defendant; and 4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3 553(a)(2). A sentence of 60 months, followed by five years' supervised release achieves those goals, providing a lengthy sentence that adequately

reflects the seriousness of the offense and provides just punishment for Mr. Tallach, for whom it is his first conviction.

    No greater term is warranted. Examining the considerations underlying an appropriate sentence, first with regard to deterrence, the learned consensus is that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). Even the Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not

intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004).

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. This is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." United States v. Beiermann, 599 F.Supp. 2d 1087, 1103-4 (N.D. Iowa 2009) ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of"). Likewise, the Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing." Commission Report, supra, at 98. To the extent the Court is concerned about sending a message to the public that this type of crime will be punished severely, the five year mandatory prison term set by Congress, while it may be a minimum, is hardly a slap on the wrist for a first-time offender.

Further, current research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012), and "online offenders who had no history of contact offenses almost never committed contact sexual offenses." Michael C. Seto *et al., Contact Sexual Offending by Men With Online*

14

*Sexual Offenses,* 23 Sexual Abuse 124, 137 (2011); *see also* Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years); Helen Wakeling *et al., Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders,* 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jerome Endrass *et al., The Consumption of Internet Child Pornography and Violent Sex Offending,* 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses ... at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders,* 17 Sexual Abuse 201, 207-08 & tbl. III (2005) (finding that 1.3% of those who had committed child pornography offenses recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb *et al., Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters,* 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court recently put it, "the empirical literature [] generally concludes that there is little - if any evidence of a direct correlation between viewing child

pornography and the viewer's commission of 'contact' sexual offenses." *Marshall,* 870 F. Supp. 2d at 492.

As a first time offender, the likelihood of recidivism for Mr. Tallach is low, despite the "conventional assumption … that the rate of recidivism (in particular, sexual recidivism) by federal child pornography offenders is high." Commission Report, supra, at 293.[2] The Sentencing Commission's own recidivism study revealed that among child pornography defendants in criminal history category I, 73.9% did not recidivate. Id. at 302.

Research into the characteristics of internet offenders suggests that those individuals who have never committed serious, 'hands on' offenses are at low risk to re-offend sexually. Studies as noted above by Seto (2005), Eke (2010), Wollert (2011), and Lee (2011) all found greatly reduced levels of recidivism (defined as any sexual offense) when comparing internet sexual offenders to similar groups with a prior contact offense. In this research, the recidivism rates of internet offenders (without contact offenses) ranged from 0-10% over periods from 2-5 years.

V. **The Guidelines: National Trends**

Defendant has already noted that the percentage of within-guideline dispositions for child pornography offenses nationally is low, specifically 30.8% in a recent USSC survey. See supra at 10. Addressing the guidelines more broadly, the rate of all within-guideline sentences nationally has consistently remained slightly below 50%, moving from 52% in FY2012, to 51% in FY2013, to 46% in FY2014, to 47.3% in FY2015, to 48.6% in FY2016 and to 49.1 in FY2017. See USSC, Comparison Of Sentence Imposed And Position Relative To The Guideline Range, Table 8, FY 2017. In this District, the rate has been well below 50%, from 43% in FY2012, to 39% in 2013,

---

[2] This notion of high rates of recidivism for people convicted of a sex offense seems to be fueled more by fear than statistics. Lawmakers and courts seem obsessed with ensuring lengthy and almost constant monitoring of sex offenders, more than any other type of offender, because of the anxiety caused by the fear that the person will abuse a child.

16

to 23% in FY2014, to 25% in FY2015, to 27.5% in FY2016, and to 31% in FY2017. See Statistical Information Packet, Fiscal Year 2017, District of Massachusetts.

VI. **Mr. Tallach's Health**

As set out above, Mr. Tallach suffers from heart disease along with a host of other significant ailments as well as physical limitations. Depending on the length of his sentence, he will predictably suffer from ever worsening health as well as the risk of a serious cardiac incident.

Older adults in prison age at an accelerated rate. The elderly population in corrections is defined as aged 50 and above primarily because the typical 50-year-old inmate has the health status of a 65-year-old or older individual outside of prison. Offenders' health problems before and during incarceration "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004), available at http://www.nicic.org/pubs/2004/018735.pdf. Moreover, offenders who committed their first crime after the age of 50 "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems," and they are "easy prey" for more experienced inmates. Id. at 10. For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma." Elaine Crawley & Richard Sparks, *Older Men in Prison: Survival, Coping, and Identity,* in The Effects of Imprisonment 343, 346-47 (Alison Liebling & Shadd Maruna eds., 2005).

Prisons are not physically designed to accommodate the infirmities that come with age. Aging defendants find it difficult to climb to the upper bunk, to walk up stairs, to wait outside for pills, to take showers in facilities without bars and even hear the commands to stand up for count

17

or sit down when they are told. Older adults, because of their increasing frailty, are especially vulnerable to victimization in a prison environment. At age 50, Tallach will join, according to statistics in 2010, some 246,000 prisoners age 50 and older in state and federal prisons combined. Edmond Ross, a spokesperson for the Bureau of Prisons, has said: "We have to provide a certain level of medical care for whoever comes to us." At Federal Medical Center Devens, 115 aging inmates with kidney failure receive treatment inside a dialysis unit. "Renal failure is driving our costs up," said Ted Eichel, the health-services administrator for Devens. "It costs $4 million to run this unit, not counting medications, which is half our budget." Devens also employs 60 nurses, along with social workers, dietitians, psychologists, dentists and physical therapists. [http://www.washingtonpost.com/sf/national/2015/05/02/the-painful-price-of-aging-in-prison/](http://www.washingtonpost.com/sf/national/2015/05/02/the-painful-price-of-aging-in-prison/). Due largely to higher health care costs, prisoners aged 50 and older cost around $68,000 a year to incarcerate, compared to $34,000 per year for the average prisoner.

    Indeed, the same prison sentence for an older offender amounts to harsher punishment than that for a young or middle-aged offender, because the sentence is a greater proportion of an older offender's remaining life and can amount to a life sentence. See Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc.Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for life expectancy due to age and illness).

    An inmate with Tallach's health problems is likely to suffer greater punishment than the average inmate because the Bureau of Prisons often fails to provide adequate or even necessary medical treatment. An audit by the Office of the Inspector General found that the Bureau of Prisons often does not provide "required medical services to inmates." U.S. Dep't of Justice, Office of the Inspector General, Audit Division, *The Federal Bureau of Prisons' Efforts to Manage Health Care* 32, 34 (2008). As one example, an inmate was referred to the chronic care clinic upon intake, but was not seen until five months later, and although an EKG performed at that time showed abnormal results, the results were not reviewed by a doctor until two days later,

the day the inmate died of a heart attack. Id. at 33. Preventive services are often not provided, chronic conditions (such as high blood pressure) and medication side effects are often not monitored, and unqualified persons are providing services. Id. at ii-xx, 32-34, 51-52. http://www.justice.gov/oig/reports/BOP/a0808/fina1.pdf. Moreover, a prisoner must first persuade the guards on his unit that he is in need of care before a matter is even brought to the attention of medical staff (or write a note seeking medical attention which is eventually routed to medical staff). A delay in reporting an acute incident can be life threatening.

Lastly, there is the terrible reality that persons convicted of this offense are at extraordinary physical risk in prison, even as the BOP's classification system places them in higher and consequently more dangerous custodial settings. One judge lamented: "The last defendant this Court was required to sentence to the mandatory five-year prison term for receipt of child pornography, a 72-year old retired attorney, was beaten to death within days of arriving at the federal penitentiary." Kelly, 868 F. Supp. 2d at 1204 n.1.

## CONCLUSION

The guidelines in this case provide the Court with little guidance in fashioning a just sentence. Instead, the Court may look to the panoply of other factors under 18 U.S.C. § 3553(a), including that his conduct was at variance with the character of his earlier years, which were marked by responsibility and achievement, as well as the grave decline in his health since being in custody, to find that a sentence of five years followed by five years of supervised release is a sentence that is "sufficient but not greater than necessary" to achieve justice here.

JAMES TALLACH
By his attorney,

Charles P. McGinty
 B.B.O. #333480
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

      I hereby certify that this document has been electronically filed this day, October 20, 2019.

                                                         Charles P. McGinty